**HAWAII TEAMSTERS AND ALLIED WORKERS, LOCAL 996, Plaintiff,**

v.

**HONOLULU RAPID TRANSIT COMPANY, Ltd., Defendant.**

**Civ. No. 71-3382.**

United States District Court, D. Hawaii.

June 7, 1972.

Thomas P. Gill, Thomas M. Pico, Jr., Honolulu, Hawaii, for plaintiff.

Howard K. Hoddick, Honolulu, Hawaii, for defendant; Anthony, Waddoups, Hoddick & Brown, Honolulu, Hawaii, of counsel.

## DECISION

TAVARES, District Judge.

This is an action filed by the Hawaii Teamsters and Allied Workers, Local 996, as plaintiffs (hereinafter called the Union) against Honolulu Rapid Transit Company, Ltd., a Hawaii Corporation

(hereinafter called HRT) in two counts, seeking a judgment:

1. Declaring that HRT has violated and breached the terms of three collective bargaining agreements between three bargaining units of the Union in behalf of their members (employees of HRT) on the one hand, and HRT, as employer (since the allegedly applicable terms of each such agreement are identical insofar as this action is concerned, they will hereinafter sometimes be collectively referred to as the Contract);

2. Enjoining HRT and its officers or agents from refraining and refusing to arbitrate the matters set forth in the complaint, pertaining to claims for severance pay and vacation pay;

3. Declaring that only two members of the original panel of five arbitrators named in the Contract are available to serve as arbitrators;

4. Mandatorily determining the method of selecting from said remaining eligible arbitrators an arbitrator to arbitrate the matters in dispute; and

5. For costs and further relief.

Inasmuch as reference hereinafter to the City and County of Honolulu will frequently be made, for brevity, it will sometimes hereinafter be referred to as City.

The complaint (para. V) claims that under the Contract (Secs. 19, 13 & 23, respectively of the three agreements, severance pay is agreed to be paid for every employee with ten or more years of continuous service *who is permanently dropped from the company's service because of a reduction in force.*" (emphasis added) This same paragraph, however, also says that "Severance pay will not be paid in the event of *resignation,* discharge, retirement or death." (emphasis added).

Paragraph VI claims that under substantially identical sections (Nos. 10, 7 and 15, respectively) of the three agreements, vacation with pay for specified numbers of days is provided for employees who have completed (a) one year, (b) more than one but less than 15 years, (c) 15 or more years, and (d) 20 or more years, of continuous service. It is also provided that "any employee *dropped from the service of the Company* who has completed twelve (12) consecutive months of continuous service since his employment or has completed twelve (12) consecutive months of continuous service since the anniversary of his employment and who has not had his vacation for that year, will be given his vacation pay." (emphasis added).

It is also alleged that the Contract provides for arbitration as to any grievances, and that this dispute comes within the purview of that portion of the arbitration agreement which states that: "A misunderstanding of the meaning of any section of this agreement shall also be considered a grievance."

By sworn allegations, affidavits and admissions the following undisputed facts appear:

The Contract has the following provision as to duration: (Secs. 49, 14 and 27 of each agreement): "Duration of Agreement. This agreement is effective and binding upon the parties from September 12, 1966 to and including September 1, 1970, and from year to year thereafter unless notice is given in writing by either party to the other not more than seventy-five (75) days and not less than sixty (60) days prior to the expiration date that it desires to modify, change or terminate this agreement at such expiration date."

By letter of June 8, 1970, from plaintiff to defendant (Mr. Harry Weinberg, Pres., Exhibit A to Defendant's Answer) plaintiff advised defendant of its intention to reopen the "agreement which expires on September 1, 1970," and in that letter proposed certain wage and fringe benefit increases, and ended with the statement: "also we wish to notify you that should we have no agreement by September 1, 1970, we shall be free to strike." The letter was received June 10, 1970 by HRT.

Following the written notice by the Union on June 8, 1970, of its desire to reopen the contract, formal negotiation meetings were held on July 23, September 2, September 10, December 30, 1970 and on January 1, 1971. At the July 23, 1970 negotiation meeting, the Union requested a 50 cents an hour basic wage increase plus 15 cents an hour in fringe benefits. The company proposed a wage cut. On June 25, 1970, it was announced in the press that the Public Utilities Commission had turned down a request by HRT for a 5 cent fare increase which had been filed on November 25, 1969. Formal notification of such refusal was finally given HRT on August 14, 1970.

On June 26, 1970, Mr. Weinberg, President of HRT, was quoted in the Honolulu Star-Bulletin as saying:

"September 1 we're out of business. . . . Your labor wants more money and they're entitled to get it. The public's entitled to its bus service. We've lost $132,000 on the utility operation in the last five months. . . We're the only bus operator in the United States to go 18 years with one fare increase and meet pay raises all the way. We're living up to our present contract to September 1 but we're not in a position to write any new contract."

On August 25, 1970, the Council of the City passed Resolution 270 asking that the City petition the PUC for a hearing to evaluate the company's assets. Such a petition was filed with the PUC by the City on September 8, 1970. It was stipulated that, by doing this, City became irretrievably bound to purchase the utility assets of HRT.

On August 27, 1970, at the behest of the Mayor, HRT agreed to continue operating on the same terms and conditions through October 1, 1970. On August 28, 1970, the Union membership agreed to extend the contract and continue working on a day-to-day basis pending City efforts to acquire HRT.

On September 4, 1970, MTL, INC., a Hawaii corporation, was incorporated under the laws of the State of Hawaii for the purpose of providing public transportation services in Honolulu.

On September 8, 1970, Bill No. 109 was introduced in the City Council to authorize the Mayor to "purchase the physical and tangible property of the Honolulu Rapid Transit Company . . .", which bill was approved as Ordinance No. 3605 on September 23, 1970.

Under transmittal letter dated September 17, 1970, the City made application to the Urban Mass Transit Administration of the federal government for a grant in excess of $10,000,000.

On October 16, 1970, the Mayor proposed to the Union negotiating committee that he would supply some $40,000 from private sources to pay the Union members about 50 cents per hour over their contract wages for a month. On October 22, 1970, the Union membership accepted the proposal and agreed to continue working.

On November 19, 1970, HRT asked the PUC (Docket 1917) for a 10 cent fare increase, citing a drop in both revenue and passengers during the first half of November, 1970, as compared with the same period in 1969. It was HRT's expressed position in its application that the requested fare increase would only permit a fair return based on the wages it was then paying. The last fare increase accorded HRT was in May, 1961. No action was taken by the PUC on this request because of the pending takeover of HRT by the City.

On October 13, 1970, Council Bill No. 128 was introduced which, as finally approved, provided for an appropriation of $1,700,000 for an "integrated Island-Wide Bus System." The appropriation authorized the purchase of 20 new GMC buses and/or 25 used buses of the Dallas Transit System, or other equivalent buses. This bill became Ordinance No. 3640 on November 25, 1970.

On October 13, 1970, Council Bill No. 129 was introduced which, as finally approved, provided for an appropriation of

$2,338,762.00 for an "Integrated Island-Wide Bus System (acquisition of Honolulu Rapid Transit Company, Ltd.)." This bill became Ordinance No. 3667 on January 13, 1971.

During the months of October, November and December, the City conducted negotiations with the Dallas Transit System and others for the purchase of various buses for use in Honolulu.

On December 28, 1970, an agreement pursuant to Section 13(c) of the Urban Mass Transit Act, as amended, was entered into between the City, MTL, INC., and the Union, a copy of which is in evidence. The purpose of said agreement was to insure the protection of the wages, hours, working conditions and other contract rights enjoyed by the employees of the Honolulu Rapid Transit Company, the Wahiawa Transport System, and the Leeward Bus Company, when the transit systems operated by those companies were acquired by the City under the Urban Mass Transit Act, in accord with the project application made by the City.

On December 30, 1970, a meeting was held between the Union, the HRT, and a representative of the Federal Mediation Service. According to the Union, the company on the basis of inadequate earnings turned down their request for a wage and fringe benefit increase and stated that as of January 1, 1971, the HRT would institute a wage and fringe cut totalling $1.1462 per hour. According to HRT, they proposed such a reduction and asked that the matter be negotiated.

The employees of HRT represented by the Union left their jobs as of midnight, December 31, 1970, and went on strike. A meeting between the representatives of HRT and the Union was held on January 1, 1971, but no agreement was reached.

Both before and after January 1, 1971, Messrs. Rutledge and Weinberg had informal meetings and conversations about the impasse between the HRT and the Union as well as the various problems arising out of the dispute between the HRT and the City, but there were no formal negotiations between the HRT and the Union, and no resolution of differences.

Since January 1, 1971, there have been no further formal negotiation meetings between the HRT and the Union. Since January 1, 1971, the HRT has not been able to operate its transit system.

On Wednesday, January 6, 1971, a meeting between the Mayor and Mr. Weinberg failed to produce any agreement as to how and under what conditions the City might take possession of HRT's business and operate the bus system pending final evaluation of HRT property.

On February 12, 1971, a contract for the City purchase of 50 buses was entered into with the Dallas Transit System. The City also contracted to purchase 17 buses from the General Motors Corporation.

On February 25, 1971, the City Council passed Resolution No. 58 authorizing the City to enter into a contract with MTL, INC. to operate a transit system in the City and County of Honolulu. On that same date, all nonbargaining unit employees of HRT quit and went to work for MTL, INC.

On February 28, 1971, the Union and MTL, INC. entered into an interim labor agreement to cover the operation by plaintiff's members of a transportation system by MTL, INC. in Honolulu. On the signing of the labor agreement, the Interim Agreement between the City and MTL, INC., concerning the operation of such transportation system, took effect.

On March 1, 1971, MTL, INC. began operation of a transit system in Honolulu using plaintiff's members and the buses purchased from Dallas Transit and GMC.

The MTL, INC. operation was on a reduced schedule over the main routes formerly operated by HRT without transfer privileges. MTL, INC. payments to employees are at the higher

rate of base wage which the Union had been demanding from HRT during the early negotiations, or 50 cents an hour more.

On March 9, 1971, hearings before the PUC commenced on the question of the valuation of the HRT's assets. These hearings continued from time to time until March 31st.

On March 26, 1971, HRT made an offer by letter to the City to sell 141 buses belonging to HRT, together with fare collection equipment, pending final determination of the valuation proceedings.

From January 1 to January 6, 1971, the Union maintained a picket line at the Wahiawa operations center of the Wahiawa Transportation System, Inc., a subsidiary of HRT. On January 6, 1971, Wahiawa stopped all bus service operations. On January 7, 1971, by agreement between Mr. Weinberg and Mr. Rutledge, drivers belonging to the Union moved buses belonging to Wahiawa Transportation to HRT premises in Honolulu for storage, and on that day picketing of HRT by the Union ceased.

Among other facts to be considered, including those stipulated to or otherwise proved by the record, and matters of which the Court takes judicial notice, are the following, some of which are a repetition of the foregoing stated facts:

It was stipulated that on August 25, 1970—the Council of the City passed Resolution 270 authorizing the City to petition the State Public Utilities Commission to value HRT's assets; that such petition was filed with the PUC by the City and County on September 8, 1970; and that "By doing this, the City became irretrievably bound to purchase the utility assets of H.R.T.".

It should be explained that in the amended charter of the HRT (L.1921, c. 186 ratified, etc., August 24, 1921, 42 Stat. 185, c. 81 by Section 20 thereof, RLH 1925, Volume II, Appendix, pages 2094–2096, as amended by L.1967, c. 300, Hawaii Revised Statutes, Ch. 51) provision is made for the purchase by the City of the property of HRT, and it was under this section as amended that, as stipulated by the parties in this case, the City gave notice of its intention to purchase the property, and requested the PUC of the State to determine the value of the property or the amount to be paid by the City for such purpose.

It is clear, from a reading of the entire franchise and the uniform construction placed thereon, and on the powers of the PUC from the inception of HRT, by local authorities, as this Court takes judicial notice, that HRT is *legally* obligated to continue the service of mass transit for which it was granted the franchise, until the final take-over by the City.

Section 19 of that franchise (RLH 1925, Volume II, p. 2094) provides:

"Sec. 19. Forfeiture. *Whenever the company refuses, fails or neglects to do, perform, carry out or comply with any Act, matter or thing requisite or required to be done under the provisions of this Act,* or any order, direction or regulation of the commission, and shall continue so to refuse, fail or neglect to do, perform, carry out or comply therewith, after due notice by the commission, *the commission may have the franchise* granted by this Act, and all rights and privileges granted thereunder, forfeited *and declared null and void* by appropriate proceedings in the nature of quo warranto before the circuit court of the first judicial circuit at law without a jury." (emphasis added).

Section 17 of said franchise (id. pp. 2093–2094) provides for permissible *temporary stoppages* of service for certain specified reasons, and goes on to provide: ". . . and the *company shall likewise not be liable if operation is temporarily suspended* by act of God or the public enemy, or *strikes* or accidents." (emphasis added).

From these provisions it is clear to this Court that, under the situation presented, as well as the facts stipulated to, the HRT *could not afford to, and did*

*not* arbitrarily cease permanently to operate, *in a legal sense,* its mass transit system, and that HRT's only legal excuse for not actually continuing to operate its buses was the uncontradicted existence of the *strike* which *excused* them under said Section 17. The fact that Mr. Weinberg, president of HRT, and its principal stockholder, may have made public statements to the effect that the company had been "put out of business," falls far short of showing that the company was *legally* out of business or had finally decided to go out of business in a legal sense. It is evidently for this reason that the HRT *never gave the City & County, or the PUC, or the Union, any official and conclusive notice of termination of operations* of HRT, and *never dismissed any of the Union employees,* and *never dropped any employees for the purpose of reducing operations.* Under the circumstances, none of these things was called for or could be legally effected without subjecting HRT's charter to forfeiture, even if the City was irretrievably committed to purchase the assets of HRT relating to the public utility operation.

It is undoubtedly for the same reason that the *Union never filed any grievances concerning alleged removals,* etc., and *never followed the grievance procedure prescribed as a condition of arbitration.* What happened was, as contended by HRT, that, realizing that, as a practical matter, so long as the Union struck HRT, HRT could not continue to actually perform its mass transit operations by reason of the strike, and that purchase of HRT's assets was inevitable, the Union members for their own benefit *unilaterally* cooperated with the City and transferred en masse into the employment of the new corporation, MTL, thereby in effect *legally resigning* as *employees of the HRT,* as found by the State Department of Labor and Industrial Relations in a related matter decided by that Department, denying unemployment compensation claims.

 While, therefore, this Court is impressed with the trend of authorities, comprising both judicial opinions and decisions of arbitrators, toward encouraging arbitration and construing contracts as favorably as possible in favor of sustaining the arbitration procedure, and treating vacation and severance pay provisions in contracts as favorably as possible towards survival of rights beyond the contract period, this Court has found *no authority on all fours with the facts of this case,* and no authority as this Court understands the numerous cited decisions and rulings, holding that (1) where the employer has been *forced by a strike to suspend operation of its business*; but (2) the *employer has not legally gone out of business nor has it made an "objective manifestation" (in the words of the Referee in his decision on the unemployment compensation claims of the employees of HRT which he denied) "to indicate that it was going out of business immediately"*; *(3) the employer is a public utility, compelled by law to remain ready for business, at* least, until and unless excused by authoritative action (which would be in this case permission of the PUC or the consummation of the Purchase by the City, neither of which occurred); (4) the contract has been terminated by the Union and expired without any arbitration proceedings having been commenced before such expirations, and before the alleged rights became final and presently enforcible:—that under such circumstances *there has been a termination of employment by the employer or a dropping from employment by the employer of the striking members,* entitling them to severance pay, and/or vacation pay, and to arbitration if this is denied.

 It is clear, notwithstanding the favorable trend of many of the authorities above mentioned toward encouraging arbitration, that the circumstances must nevertheless be such that an *existing contract specifically provides for the arbitration, or can be reasonably construed to provide for it, and that such rights of arbitration or the grievance originated and became enforcible before the contract expired.* No such situation

has been shown to exist in this case, and therefore the claimed right to arbitration is non-existent.

One of the grounds urged by the defendant HRT against arbitration was alleged impossibility to comply with the selection of arbitrators, in that the original Contract provided for 5 named arbitrators, 3 of whom were allegedly disqualified or unavailable at the present time, and the procedure of selecting a final arbitrator was, for each side alternately to strike out one name until there remained only the 5th person named, who would then be the arbitrator.

Although it is unnecessary to decide this question, this Court believes that this contention, per se, is not sound, because of the fact that there existed at the time the Contract was entered into, a general Federal statute on arbitration providing in part as follows:

"§ 2. A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

"§ 5. Appointment of arbitrators or umpire.

"If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require,. who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator." 9 U.S.C.A. §§ 2 and 5.

Under this statute, as this Court construes it, this Court could, if arbitration was required, order the parties to name 3 other arbitrators to enable the parties to proceed literally with the procedure of the arbitration contract for selection of arbitrators, or this Court could arbitrarily, if the parties failed to agree, name 3 other disinterested arbitrators, which would likewise enable the parties to follow the contract procedure of the selection of the final arbitrator. There may be other possibilities, but these would be sufficient to render invalid, in this Court's view, the particular contention that arbitration should be denied solely on the ground of impossibility of following the procedure for designating the arbitrator. *This Court's decision, therefore, is not based on that particular contention of the employer.*

This matter was brought to issue by a Motion to Dismiss Complaint on the part of the defendant, and a Motion for Summary Judgment by the plaintiff. In accordance with the foregoing opinion, the Motion of the defendant to Dismiss the Complaint is granted, and the Motion of the plaintiff for Summary Judgment is denied.

An Order in accordance with this decision will be prepared by the defendant's counsel, approved as to form by counsel for plaintiff, and if the parties fail to agree upon the form, the matter will be submitted to the Court for final determination. The Order shall include costs awarded to the defendant.